First case this morning is case number 4111006 in Raid Marriage of Armstrong. For the appellant we have Gregory Scott, Joshua Watson, for the appellee John Gray, and Peggy Ryan. Have you split your time accordingly for arguing? Okay, please proceed. May it please the court. My name is Gregory Scott. I represent Mr. David Armstrong and with me at council table is my associate Joshua Watson. We brought this appeal of Judge Olson's ruling in this case based upon three different areas that we believe that the court erred. The first area that we believe that the court erred was in its computation and use of the 1997 income tax return. And I would invite the court to review our exhibit number 67. Mr. Scott, before getting into that, let me ask. Did the trial court issue an order directing the parties on May 10, 2010 to provide the court with various specific information concerning matters pertaining to the farm? Your Honor, the court did and we provided all the information that was available from my client. Did the opposing side file a statement and did you file a statement as well? Your Honor, both parties filed statements up to the day of trial. They were changing up to the day of trial. What specifically, with regard to the May 10, 2010 order, was there a specific response to these specific questions filed by your client? We did, Your Honor. We filed position statements with regard to that. What is a position statement? A listing of all governmental payments received. Did you do that? We did. We provided the acreage based upon the actual acreage farmed, not the acreage that was computed by their model. We provided the statements from Prentiss. We provided the tax returns. We provided our breakdown as to the earnings per farm. One of the problems that existed in this case from the get-go was that in 2005, when this came back from this court, we are then trying to reconstruct records that are based some eight years before, some of them two years before, but from 1998 to 2005. Some of the records, like the trucking, the court wanted us to try and provide trucking records that were no longer in existence. What about the records that were in existence that you failed to prove? We did provide all of those. My client had consented to the FS-8 records. How long did that take? Well, Your Honor, I wasn't in the case at that time, but from the record. You're not on trial, Mr. Scott. How long did that take? In 2008 is when that occurred. When were they ordered? That was when it was ordered. How long did it take for compliance? As soon as they were ordered, it was complied. My client signed a release with the FS-8. When were they first requested? Your Honor, I don't have that part of the record with me, but I believe it was... The reason I'm trying to figure out what's going on here, Mr. Scott, is Judge Olson is an experienced jurist. He seemed to think that evidence and things as directed weren't forthcoming from your client. Was he wrong? Yes. Why? Well, he was wrong for a number of reasons. One, my client signed the release with the FS-8. The FS-8 documents were all delivered to Mr. Knoll and to Ms. Ryan. Those records contain each of the farms that my client farmed and each of the records concerning the government payments, what government payments were paid for which farm and for which year. And as my client provided evidence of, he went to the FS-8 office with his records and those records contained the information concerning the amount earned on the respective farms and on the FS-8 payments. Now, those records were taken and those records were assembled by Ms. Fronson and a number of the records were duplicated for different farms because she had difficulty identifying farm numbers with farm production. We even tried to have a gentleman from the FS-8 issue a report to clarify that and they objected to that coming into the court. We did, Your Honor, produce Exhibit 116 which clarified for the court each of the farms, who farmed them, when they were transferred, what were the farm numbers. With the FS-8, the testimony is that my client would go there on an annual basis. Sometimes Betsy would come and sign some documents, but the majority of the time my client would sign the documents. The secretary at FS-8 would prepare them. And when farms would switch numbers over the course of these years, those farms weren't always deleted, which caused problems in the interpretation by Ms. Fronson for Ms. Plunkett. So we produced all the records that were available. Not only, Your Honor, did we produce the Prentiss Hall grain receipt records. There were 800 and some pages. Well, but that's a turn of art, all the records that were available. Judge Olson didn't believe you that, sure, these are the records, but I don't believe, says the judge, your client is doing what he's supposed to. But, Judge, if you look factually… Why isn't that a matter of fact, the trier of fact, that we should give deference to? Well, Your Honor, if you look at what was produced, it does not correlate to the ruling. And I think that's where the error comes in. We had tax returns each year. We had the same accountant that the judge relied upon in 1997 to compute this tax return that he says he used as a basis. 1997 was a year and the numbers that he used included executor's fees, capital gains, dividends and interest not associated with farm operations. Those are included in his number of $86 per acre. It also doesn't take an adjustment for income taxes paid. Although in his statement at motion for reconsideration, he says I took that into consideration. It doesn't flow with the facts. And, Your Honor, it wasn't just tax returns because throughout the proceeding, Judge Olson said I'm not going to just rely on tax returns. So what we produced is not only the accountant, we produced the records on all of the government payments and we broke those down for him between himself and the land that was transferred to the girls that the judge included. We broke down the – we had a cash reconciliation that was prepared by the accountant who testified to that. We had bank records and the accountant testified that he took the bank records, all the receipts that came in each year, all the 1099s that came in each year, and each year he sat down and that's how he verified it. I don't want to take up all your time at this point, Mr. Scott. I appreciate your effort to address it, but I know you have other things you want to address. Yes, Your Honor. With regard to the tax issue, Judge Olson said he looked at – and if you look at the exhibit 67, he used a gross income figure. He didn't take off the income taxes. If you look at his statement, he said if you take this figure of 274 and you divide it by what he considered was 3,200 acres is what he determined was the acreage he was going to use. If you take that acreage, it's $86 an acre, and then he says I'm rounding that up to $100 an acre. There's no evidence that shows that he deducted any taxes associated with that. If you deduct taxes, it's $45.20 an acre. None of the parties' income tax returns or any of the documentation supports that they made $100 an acre net after taxes. We believe, Your Honor, that the statute and the case law clearly says that the court must deduct taxes. Of the 3,200 acres, how much of that was owned versus rented? I believe that the records initially showed that there were about 1,700 that were rented, and I remember the testimony somewhere around 1,400 owned. And the trial court applied the $100 per acre to the same way as to leased property? Yes, Your Honor, because the leased property generated the government payments and it generated the farm income, and that was what the court used as a basis of $100 an acre even on the leased property that cash rent was being paid for. So the court didn't make any determination whether one could profit more on property owned versus property leased? There was no delineation between the two, Your Honor. Did you make such an argument that there should be? I did not, Your Honor. I did not. We made an argument based upon actual earnings that were shown, and we delineated those arguments as to actual earnings when we get to the manifest way of the evidence section of our argument based upon actual earnings that came in off of the farms, including if you added back the income from the portion of the 32 acres that was forwarded to or transferred to the girls. Was the trial court ever presented for each year how many bushels of corn per acre were raised, how many bushels of beans, what the average price of soybeans and corn was in 1998, 1999, 2000, etc.? Your Honor, we did not present the actual bushes grown on each farm because that was not available to us. What Mrs. Armstrong or Plunkett presented was an average based upon yield averages in Morgan County. But the differences occur in what you are going to take off as deductions and what you're not going to take off as deductions. But as far as the taxes are concerned, Judge, we believe that if the court takes off taxes, that the amount per acre is substantially less. Mrs. Armstrong raised in her reply the fact that if you take into account depreciation, it offsets the taxes. We, in our reply, show that that isn't the case because of the fact that there were substantial purchases and cash outlays for equipment in excess of the depreciation. So the payments, the actual profit off the farm that the judge used, did not take into account the taxes that were paid. So we're basically allocating profit on gross income versus net after tax. That's our first argument. With regard to the second argument, Your Honor, what we believe is that the court's ruling is against the manifest weight of the evidence. There is not evidence in the record that would support $100 an acre in profit. It appears in the record, number one, the trial court didn't believe your claims. There was a problem with the trial court believing Mr. Armstrong. What was wrong with it? With the trial, if I look at the record, it seems to me the trial court appeared to be correct. Well, Your Honor, I don't believe that the court can ignore evidence even if the court has a disposition against my client that he doesn't like him or doesn't accept some of the things he says. Did you even do what the trial court asked you to do? I believe we did, Your Honor, to the extent that records were available. The problem is, as we state, reconstructing after the fact is a difficult undertaking. But if you look at the actual facts that were presented, the court ignored the fact and made an assumption that the years from 99 through 2003 were excellent years in farming. The testimony is totally to the opposite of that. Alan Worrell, who was a farm manager, testified about the reasons for the farm subsidies in those years was because the commodity prices were so low that they needed to have that in order for the farmers to even make a profit or to break even. The same thing was testified to by Mr. Armstrong and by the accountant. So that assumption by the court is not supported by the evidence. With regard to the actual earnings... Did your client receive an LDP for each of the years? Yes, Your Honor. We presented to the court the evidence of the three different payments that were made. And did the LDP guarantee a certain commodity price? It did, Your Honor. And what was the commodity price for each of those years that it guaranteed? That varied based upon when he would plug it in, and we didn't have the total on that. Could you give me a range? Like $2 a bushel for corn, $2.20, $2.50, $2.30? Your Honor, we didn't break it down that way, and I don't have that. What we broke it down was total payments. And as Mr. Worrell testified to the court, my client had a max out each year in each of those different types of payments. The flexibility payment was one. There was a market loan payment, which was another, which was combined with the LDP to maximize up to $75,000 per year. My client, and we put a schedule in our brief that showed his actual payments from all three programs versus the total that he could claim as a producer. And one of the difficulties in the farming community at that time was that each producer had limits. And the parties acknowledging this, even before they split, had their daughter listed as a producer on the Dock's Farm in 1997 and then 1998. Also, Your Honor, Mrs. Plunkett was the bookkeeper for the farm through 1998. If you look, as we've stated, in 1998, the amount of money that came in in 1998 was substantially different than 1997. Mrs. Plunkett was the person that did all the books in 1998. She's the one that allocated some of the income to the daughters based upon them being FSA producers. She met with the accountants. She was the one that also had a book. I'm sorry. You mentioned 1998. I'm sorry with my voice today. Was that the year that the parties said the corn crop was about 45, 46, 47 bushel per acre? I don't believe that evidence was ever produced as to what it was per acre, Your Honor. But in 1998, the parties separated. That was the year that Sally also worked in the fields and sat down with the accountant at year end to make that determination. I would point out, Your Honor, that the court in November of 2009 indicated that it was not claiming any party. So it is in 2011. I'm looking at that brief on page 15. It says, in 1998, David's statistics showed a 47 bushel per acre yield while Sally's showed a 45 bushel per acre yield. Cites the record, but you're saying that is not what the evidence showed? Your Honor, I don't recall that in the record. If that's in the record, I will stand by what the record states. But, Your Honor, the earnings for the year of 1998 are substantially less than the amount used by the court. If you look at the earnings of Mr. Armstrong throughout the entire period, they're substantially less than used by the court. If you look at the evidence of the portion of the land that was transferred to the girls and the income off of that land that the court included, all of that income together is less than what the court assumed. And I believe that the court assuming that and carrying out this assumption is against the manifest weight of the evidence. There's not evidence to support $100 an acre in net farm profit. I would also point out to the court that in looking at net farm profits, what the court ignored in our opinion is the fact that these entities that they had, the Armstrongs themselves, could only have the amount of money of one producer from FSA. They couldn't get these additional FSA monies. There's no evidence that the FSA monies that went to the girls ever came back to David Armstrong. In fact, they invested it themselves. The testimony was that they, in fact, used that and they bought land for themselves and homes for their families and it did not come back to the Armstrong money, for lack of a better term. What did the trial court think of that transfer from Mr. Armstrong to the girls? Well, the trial court thought that that was inappropriate because of the fact that he was diminishing the Armstrong estate. And in our argument, we assumed that the court used the whole 3,200 acres  But the Armstrongs, even if they had 3,200 acres, were limited on their government payments. That's not taken into account by the court. In addition, the farm profits that the court used were determined based upon its statement in December of 2009. It says, I'm going to take all the income that comes in, I'm going to deduct all the mortgage payments, the taxes, the expenses, and the like. Counsel, you're out of time, but you'll have rebuttal. I apologize, Your Honor. May it please the court and counsel and Mr. Armstrong and Mrs. Plunkett, I represent Sally Plunkett, formerly Sally Armstrong. A couple of things here. First is with respect, Justice Steidman inquired with respect to a statement that the court required in 2010. And in 2010, the court said, issued a pretrial order, trying to get to the bottom of all these things, ordering each side to provide certain things. Mr. Armstrong was the farmer. He was solely and completely the farmer from 1998 to 2003. He controlled the records, which put my client at a decided disadvantage because she had no ability to get at these records short of what she did, which is to request FSA records, because the FSA records has the certified acreage that Mr. Armstrong farmed. Now, sometimes those pieces of acreage were in the name of children, but he farmed it. He had power of attorney. He signed all of the forms. It was about a two-year battle to get those FSA records, because federal government doesn't have to respond to subpoenas. It requires consent to get the information. I'm not sure I understand. It's been a while since I was a trial judge handling these kinds of matters. But, you know, I'm the old school. When orders are entered, I expect them to comply with. And during that time, so did my co-counsel. I wasn't involved then, too, but, boy, they sure did. And I think there were five or six rules to show cause that issued. And what happened? Well, I mean, there was no jailing or anything of that sort. Why not? I don't know. I don't know why. I do believe that. Why wasn't Mr. Armstrong locked up until he signed the release? Don't know. Was that requested of Judge Olson? Well, on the rules to show cause, on a standard petition for rule to show cause that was filed, I think that they asked for any enforcement mechanisms necessary to get him to do it. Whether there was a specific request, a body attachment issue or something, I don't recall that. Was Mr. Armstrong present at the hearings on these matters when he was told to issue these? Sometimes was. Sometimes wasn't. There were lots of hearings I had as a trial judge where I said, you know, Why don't you, Mr. Bailiff, take him away? Right. How does that not happen in Sangamon County? It wasn't Sangamon. It was Morgan. Morgan. Okay. And I don't know why, but I do know that with respect to he finally did sign the receipt necessary or the consent necessary for us to get these 4,000 pages of FSA records. And the reason those were important are because for a course of years we were not able to get the documents necessary to construct what the marital farm operation profits were. So the best scenario then was to put together a model based on these FSA records of what he said on these certified documents, what he had farmed, and to apply government statistics. And with respect, Justice Turner asked a question regarding how much, what were the price of crops at the time and what were the number of bushels, the yield, and so on and so forth. What we did is we used these government statistics, either NASS or the SBFM from the U of I records, and took the acreage and applied these statistics. Now, was this the perfect, best way of doing it? Absolutely not. And one of the things we were mindful of is that Mr. Armstrong, by all accounts, was a much better than average farmer, and these are average statistics that we were using in this model. Were there mistakes? Of course there were, because the FSA records were far from perfect, because like a deck of cards, these farms were being shuttled about. These lease farms were being shuttled about, and it made it very difficult for our person, our individual who was working on this, to apply it to the model. And boy, we did the best we could. And boy, every time that we found out we had made a mistake, we corrected it, and we brought it to the attention of the court, and we brought it to the attention of counsel in attempting to get a picture on what the profits of this operation were. At my brief, the brief that we wrote, I did set forth what the yields were for the bushels, and Justice Turner, you're right, a lot of times in the neighborhood of $2, $2.23, $2.20 a bushel on corn, and then on the beans as high as $7.39 in 0-3, and then down about $4.75 in 1999. So there was a variance, and that's what we used, because we didn't have the actual records. Back to that order that you mentioned earlier. You would agree that in 1998 if the corn crop was 45, 46, 47 bushels per acre, it would be impossible to make $100 an acre. Let's talk about 1998, because in 1998 the gross income for the farm was $1,055,000, that's reported. There was a depreciation deduction, paper depreciation deduction, and there was testimony by their accountant of these paper depreciation deductions. You add that back up to $120,000, and then they also had mortgage deductions for acquiring land wealth. And Mr. Armstrong is in the position that he's in now because he got the farmland and he acquired substantial wealth because of it. I mean, I think most of us know what happened with the values of farmland over the course of years. So you add back that mortgage deduction for land, and you add back the depreciation deductions and real estate taxes, you are at $114.60 per acre net for 1998. For 1997, if you just add back the depreciation deduction to what they reported as the farm income for that year, you're above the $100 an acre net. When you say add back the mortgage deduction, are you talking about principal, interest, or both? Well, in terms of the mortgage interest, that is what was deducted on the tax return. They deducted the principal. But are you adding that back in? I am adding that back in because the task of the trial court was to establish marital farm operation profits, not to address the issue of what kind of wealth is being built through the payment of mortgage payments on land. I can see you adding the principal back in, but the interest is a legitimate deduction. Well, in terms of it being an operation deduction, the testimony of the experts were that with respect to it being an operational expense, it's not. It's a land expense. And the operational expense are the cost of putting the crop in, the cost of protecting it while it's in the ground, taking it out, getting it to market. Those are the operational costs. So, no, we did add back in. When I'm doing this analysis here, we add that back in. Well, the person has to pay their note. They have to pay the interest. They have to pay some principal. Otherwise, you get defaulted on. So don't disagree with you. On the other hand, if you're looking at that aspect of it, then in terms of but that land is in terms of the wealth that Mr. Armstrong is acquiring. I mean, he was acquiring huge amounts of wealth because of that reality that he had the land that he owned that he was farming on. And in terms of the operational cost, I understand what you're saying, Justice Turner, on the issue that you do have to pay your note. Well, I'm not necessarily disagreeing with you all. Maybe it's just a technical term, but to me, paying your interest would be an operational expense. Maybe, again, it's semantics. And let's talk about taxes for a second because that is also an expense that Mr. Scott brought up. With respect to the tax issue, Judge Olson specifically said that his $100 an acre figure was net of taxes. He specifically said that to be the case. And he also said that with respect to 1997, he said that his view of the 1997 tax return was that was a start. He used that as a start. That wasn't the start and the finish. That was the start. And Mr. Armstrong, during the course of the entire roughly five years at issue, he insured 4,100 acres. So in many respects, as set forth in the model, the judge's use of 3,200 acres was low because FSA records showed more than 3,200 acres being farmed. So Judge Olson, and I don't fault him, this was difficult. He had to basically reach certain conclusions. He had to look at certain things generally simply because of what was out there and the lack of specificity in this case. But it was 4,100 acres that Mr. Armstrong, and Mr. Armstrong alone no children ever mentioned in these insurance documents he was insuring 4,100 acres. So if you look at 4,100 as your starting point, the judge indicated I could set the price anywhere between 45 or 50, I think he said, and 150. And I'm going to set it at 100. And he had before him, in terms of information, everything that we had put forth in our model in detail. And then he had the FSA records. And ultimately, in terms of this order that the judge required each party to harvest each year from all acreage, they never did it. We never got the number of acres harvested. We never got a specific breakdown of what are the expenses for this farm. We never received a list of all government payments for each farm. And with respect to these government payments, I mean if you look at the ledger and you say, all right, I'm going to the FSA documents. And by the way, the government payments, the reason we got government payments is because we finally got those FSA records, not because they said, hey, here's a list of all the government payments that we made. It's because we got the FSA records and went through all of them to try to ascertain what the government payments were. So they never provided that. We were ordered to do that in June. In 2010, early 2010, it was July. We filed ours. We didn't get theirs until early 2011 because of this changeover in government because David Liefers was representing him. He got out. He didn't produce that. Then Mr. Scott got in. Before that, there was Mr. Keith and Mr. Narmont. And it was just extraordinarily challenging to get any kind of information in this case, which gets into the whole issue of there was interest that was assessed on the judgment that Judge Olson came up with. And initially, he assessed interest at 9%, pre-judgment interest, back to 2005, which was the remand date. He then issued an order. Suis Ponte said, I'm changing it to 5% because I erred on the 9%. I believe that Judge Olson thought the interest act applied. And the interest act addresses the 5% interest. In fact, there's substantial authority under cases of equity. You can assess any kind of pre-judgment interest that you believe to be equitable. And I believe that Judge Olson mistakenly thought he had to use the interest act and that he had to use 5% and that the interest, pre-judgment interest, actually should be 9% rather than 5%. Judge Olson said. I tell you, then you don't think 5% is equitable. I think 9% was equitable. Actually, something more than that was probably equitable. Now, Judge, I'll be straight with you. Had they not appealed, would I be appealing? No. I mean, this thing needs to go to bed. For all things, there is a time. I mean, there is a time for this thing to be done. But he was right on the 9%. And I think he just made a mistake in taking it back to the 5% interest rate under the interest act. You know, the court said that it took taxes into consideration. Other than that statement in and of itself, is there evidence of that? Well, certainly if you look at our model, he could have, he ended up with a judgment figure of about $770,000, $780,000 for our client with interest added on. He specifically said, I find if I had to go with one party's evidence, I go with Mrs. Plunkett's evidence. And in that case, he would be having to write a $3 million check. And instead, it's more like a million with interest added on. So he could have, in terms of his analysis of all of the evidence, he could have added on the tax figure that they say should have been added on, and his $100 an acre figure is still so far within the realm. So basically, if you look at a standard trial court case of, okay, I'm valuing the house at $250,000, the other side values it at $400,000, and the judge comes in and says, I'm putting a $300,000 value, he was so far within the range of where they were and where we were in terms of evidence. I thought opposing counsel said, I apologize for my voice today, that if you take taxes into consideration, the amount would be about $45 an acre. Isn't that what they argue? No, they say, yeah, but it's not just taxes. That's all sorts of reasons that they come to a $45 an acre figure. I think he said $86, and then if you take taxes off of that, knock it down to $45.20 if I understood his argument correctly. I thought there were more factors in there, but I don't know how that could really be the case here. But in terms of taxes, I think that the court, his $100 figure, he made it clear that was net. And he also made it clear, because he gave a really long, at the end of this case on motion to reconsider, he sat back and shared his thoughts. It was almost just a narrative of, here's how I'm thinking, and I attached that to one of the briefs. But he said, I considered everything. I did not want to push him. He was really frustrated, and understandably so, because this had gone on so long. And there were so many reasons for him to be frustrated in this case, and for us to be frustrated, because we were all trying, at least our side, really trying to get the information necessary, and we couldn't. And we put together this model because we had no other choice. And because of the delays and things, we were then put in a position where, okay, we present this model, and now we're in this position of, they're sitting back throwing darts at our model, because they've never produced anything, and we had to defend that. And our expert had to defend it. And we went into this thing knowing, hey, this is tough. We created this model. If they didn't have the documents, so they really couldn't produce them. Are you saying that they should have had the documents? They lost them. They destroyed them. Is that the insinuation? Yes. There was testimony. Each one of those daughters testified, oh, well all the records are kept at Dad's house, and we have file drawers full of records there. We never saw those records. No one ever produced those records to us. With respect to the ledgers that they keep in the trucks, when the truck goes and drops off the drain, they keep ledgers. Excuse me. Mr. Scott, if that's your client in the back shaking his head vigorously, please instruct them to otherwise, because this is not a court that is going to put up with that kind of behavior. There were trucks that had these ledgers, and the farm helper, whoever the farmer was who dropped off the drain, would keep the amount of the yield from each farm in the truck. Never got those. And, you know, it's not like this case went away, because it went up on appeal, then it came back, and this whole suggestion that, okay, things are just gone, or they're thrown away, it defies logic to a certain degree. It was represented by very, very able counsel that these things would be gone. And we found ourselves in the position that we found ourselves in because none of these records were available. The fact that there were rules to show cause issues, and that Judge Olson commented on the obstructive nature of Mr. Armstrong, on the vindictiveness toward our client, there was a basis for everything he said. He is not, I mean, I've practiced in front of him for years, and he's not the kind of guy who's going to say those kind of things without there being any basis at all for saying those things. So... The briefs in the trial court, in your argument, is that when he would cash rent or crop share lease, that he could himself transfer those leases to a new lessee. I don't understand that. Isn't that up to the lessor, the owner of the ground? The landlord, certainly. And by the way, we always backed out the cash rent judge. I mean, in terms of our model, it always backed out the cash rent. And he said, yes. And the landlords, this whole concept, okay, I was transferring leases all over the place to maximize government payments, that's an argument later made. Because in the earlier record in this case, it said things like the landlords didn't want to deal with the messy divorce, and that's why I'm transferring leases. This is a part of the passage from generations. And, you know, that... Well, if the landlord didn't want to deal with the messy divorce, why not just find a new tenant instead of someone within the family? Because the landlord, he's still the farmer. Nothing changed. And there was testimony of that. Just because a daughter was listed as a producer, nothing changed. He had power of attorney for them. He still negotiated all the prices. He still negotiated the fertilizer. He went and bought everything. No one knows. Like if you went and bought fertilizer, no one knows whose land that ended up on and whether it was one of the daughters who was named as a producer or he was named as a producer. Everything stayed the same. But the record is these daughters were actually out there driving tractors, hauling in corn, planting. They weren't doing any of that. They were very young. One of them was still in high school at the time. Then they moved on to college. One of them, I mean, they lived way far out of state, some of them. So the answer is yes. Yeah, to... I'm sorry. Well, the question he asked is, the record shows the daughters weren't actually out in the farms. You are absolutely correct. The answer is yes, and I should... it is. And may I also say, with respect to the statements that were filed, Mr. Armstrong testified he never read them. The statements that they filed, he never read. Thank you very much, sir. Thank you. Revell, please. I want to get to the highlights, if I can. First of all, Your Honor, with regard to the issue with regard to interest, since I didn't argue that last time, I just want to point out a couple things. First of all, the court in November of 2009 said that it was not blaming anyone, and the case law says that you can't use interest as a sanction. You can use it if you have some correlation to making someone whole, if there's some vexatious delay. I believe we've given you the case law that shows that's not the case. No vexatious delay in this case? No, Your Honor, not as defined by there. How come your client was never jailed? Well, Your Honor, my client was never jailed, I think, in part because Judge Olson, in November of 2009, after listening to all this for four years, says, I'm not blaming anybody. It's very contentious. Both sides are doing this, and both sides are arguing. That's not true. About in 2010, when there was... these statements weren't complied with. Well, we kept giving him the information that we had, Judge. That's why... That we had. You know, that's always the term of art, Mr. Scott, and if a judge thinks that's not the information, then isn't that... The question I asked you earlier, isn't that a finding of fact subject to manifest weight of the evidence review when Judge Olson says, you guy's a liar, and he's an obstructionist, and he's acting convictively so as to keep the property away from his former wife. Isn't that the standard of review we should apply? Yes, Judge, and when you look at the actual facts that were presented, I don't think those are supportable, and that's what we're telling the court, and that's our position. I would also point out that the court used the entire years from 1998 to 2000, and this court, that's a double dipping, as we brought up, and if you look at the testimony of Mrs. Plunkett, she acknowledged that one year the profits go to the next, to the next, to the next, including after payment of the mortgage payments, and after the equipment payments. And if the court recalls, from 1998 to 2000, all of that stuff rolled in and was divided by the court in 2000. So all the income from 1998 to 2000 is in the property division, as acknowledged by her in the record. And, Your Honor, Justice Turner mentioned, and specifically in your ruling in the appellate court, you said the debts and the profits generated are to be divided, which includes mortgage interest, taxes, and the like. Those are legitimate expenses for production of income. He can't produce that. Every year this profit from one year rolled into the next crop, and that's the evidence. And so, Your Honor, with regard to interest, I think you have to make a finding on vexatious delay that there was some amount of money that was known that he was supposed to pay. Look at what their proposal is. They proposed that he pay $1.8 million. That's $700,000 a year profit. That's not related to anything. They said that he farmed 6,500 acres. Their first appeal acknowledged they have 3,100 acres. She was the bookkeeper. She knew what they had. And then their model generates all of this extra acreage, all these double countings, all of these other assumed facts, and my client is forced to defend that, and their position is, well, you should have paid. Well, what should he have paid? The facts show what we propose. So maybe he should have paid interest on $169,000, but the court said when they asked for interest in September of 2009, hey, we don't pay on prejudgment interest in divorces. Hey, there's no amount determined. That's September of 2009. So how does he go back to 2005? And that's why we believe, you know, what's my client supposed to pay? So, Your Honor, I believe when you take an approach of inflation of facts and figures, which is what their model did, and we pointed out where and how, and ignoring facts, and Mrs. Plunkett knew she was the bookkeeper, and she didn't have a whole lot of input into the model. So Mrs. Plunkett knew how many acres. In fact, we pointed out in the record how she signed applications for loans where they verified the amount of acreage. And her position paper before this court verified that amount of acreage the first time, and I disagree with counsel. We didn't come up with this new theory about transferring leases for government payments. That was, as we quoted, was in our first brief to this court and in the first record. And with regard to transfer of leases, yes, the money, what did change with the transfer of leases is the money from those farms went to the three girls. It didn't come back to Mr. Armstrong. Now, in our argument to you, we say even though they got the money, you can assess it to him. Your Honor, we'd ask you to put a relief. Thank you. Thanks to both of you. The case is submitted.